HALL CONTRACTING OF KENTUCKY, INC.,
Appellant,

v.

James HUFF; Hon. Douglas W. Gott, Administrative Law Judge; and Workers' Compensation Board, Appellees.

NO. 2015–CA–000375–WC

Court of Appeals of Kentucky.

RENDERED: SEPTEMBER 18, 2015; 10:00 A.M.

Brief for Appellant: Patrick J. Murphy, Lexington, Kentucky.

Brief for Appellee: Jerry P. Rhoads, Madisonville, Kentucky.

BEFORE: COMBS, NICKELL, AND VANMETER, JUDGES.

*OPINION*

COMBS, JUDGE:

Hall Contracting of Kentucky, Inc., petitions for review of an opinion of the Workers' Compensation Board which reversed the order of the Administrative Law Judge (ALJ). Following an evidentiary hearing, the ALJ concluded that the claim of James Huff against Hall Contracting was not compensable since Huff was engaging in horseplay and thus he was acting outside the scope of his employment when he was injured. On appeal, the Board determined that the ALJ had erred by concluding that Huff's injury was the result of horseplay. The Board remanded for entry of a decision that would resolve all of the remaining contested issues. Finding no reversible error, we affirm.

Huff began working as a heavy equipment operator for Hall Contracting in 2007. On the morning of August 26, 2011, Huff and his coworker, Keith White, were assigned to work at an Owensboro construction site. They were assigned to relocate utility poles that had been laid upon the ground. White was acting as a "spot-ter" as he walked next to the forklift that Huff was operating. While searching for dunnage boards to stack the poles on, White found an object that he could not identify near some pallets on the ground. The object was round and dark in color. It was the size of a tennis ball, and it had a deep crevice.

In his deposition, Huff testified that White handed him the object, and he looked it over for any identifying markings. As Huff reached to retrieve a cigarette lighter from his pocket, White moved away in anticipation of an explosion. Huff ignited a flame, and the object immediately exploded in his hand. Huff was severely injured and was transported by helicopter to Jewish Hospital in Louisville. Because of his alleged violation of the company's safety policy, Huff was terminated by Hall Contracting.

In September 2011, Huff was advised that his claim for workers' compensation benefits had been denied. He was released to full duty work on May 23, 2012, and he filed an application for resolution of his claim on August 19, 2013.

Following an evidentiary hearing, the ALJ concluded that Huff's claim was not compensable. He believed that Huff's descriptions of the conditions and events preceding the explosion were not credible and that he had failed to sustain his burden of proving the work-related nature of his injury. The ALJ held that Huff had ventured outside the course and scope of his employment when he ignited his lighter "to amuse" himself and White with what he believed was a smoke bomb. The ALJ believed that Huff was engaged in "horseplay" at the time of his injury, and he ordered the claim dismissed.

Huff filed a petition for reconsideration contending that the ALJ had erred by concluding that he was engaged in horse-

play at the time of the explosion. On the contrary, Huff argued that he was acting wholly within the course and scope of his employment when he tried to identify an object brought to his attention by a co-worker by illuminating it with his cigarette lighter. Nonetheless, the ALJ denied the petition.

On appeal, a majority of the Workers' Compensation Board panel concluded as a matter of law that Huff had not been engaged in horseplay at the time of his injury because he had not ventured from the course and scope of his employment when he tried to identify the object collected by White. The majority observed as follows:

> The testimony of White and Huff establish[es] Huff was not attempting or planning to engage in any type of mischief or playful conduct when he ignited his lighter causing the spherical object to explode. Clearly, Huff exercised poor judgment after receiving the spherical object. However, the testimony of White and Huff establish[es] they had a duty to determine whether the object was dangerous and if so, to ensure it did not impose [sic] a threat to anyone's safety. As noted by Huff, he and White could not discard the item *as they must deal with anything they found.*
>
> * * * *
>
> The fact Huff held the object in his hand when he ignited his lighter without the intent to engage in a subsequent inappropriate act, does not constitute horseplay. The evidence does not establish Huff intended to engage in a sportive or whimsical act which would affect White or any portion of the job site. [Emphasis added.]

The applicable standard of review by the Board differs depending upon whether questions of fact or law are presented for its consideration. As the claim-

ant, Huff had the burden of proving each of the essential elements of his claim. *Wolf Creek Collieries v. Crum,* 673 S.W.2d 735 (Ky.App. 1984). As the fact-finder, the ALJ had the latitude and the prerogative to judge the credibility of the testimony and to choose which evidence to believe. *Caudill v. Maloney's Discount Stores,* 560 S.W.2d 15 (Ky. 1977). However, the ALJ's application of the *law* to the facts as he finds them is subject to the Board's plenary review. *A & A Mechanical, Inc., v. Thermal Equipment Sales, Inc.,* 998 S.W.2d 505 (Ky.App. 1999). Upon our review of the Board's decision, we may reverse *only* where the Board has overlooked or misconstrued controlling law or has so flagrantly erred in evaluating the evidence that it has caused gross injustice. *Western Baptist Hosp. v. Kelly,* 827 S.W.2d 685 (Ky. 1992).

Hall Contracting contends that the Board erred as a matter of law by substituting its judgment for that of the ALJ. It contends that the evidence indicates either that Huff was aware of the nature of the object and intended to ignite it for sport or that Huff acted with an unreasonable lack of concern for his own safety by holding his cigarette lighter next to it. Hall Contracting describes these actions by a heavy equipment operator as a "purposeful excursion and extended deviation from the course and scope of his employment." On the other hand, Huff contends that the evidence shows that igniting his lighter was merely a spontaneous action in response to being questioned about a foreign object found on the construction site. He denies that his inspection of the object was in any way disconnected from his work. On the contrary, he believes that his job description mandated his close scrutiny of any such object.

Under the circumstances of this case, specifically including the facts as found by the ALJ, we conclude that the Board was warranted in concluding that the incident which caused Huff's injuries did not constitute horseplay. Horseplay is defined as an action independent of and unconnected with work. *See Hayes Freight Lines v. Burns,* 290 S.W.2d 836 (Ky. 1956). There is no substantial dispute with respect to how the incident occurred in this case. And the question of whether those facts show that Huff was involved in horseplay is one of law. In *Hayes Freight Lines,* the court observed that compensation is not ordinarily recoverable under the workers' compensation act where injuries occur while the employee is not performing services growing out of and incidental to his employment.

In this case, however, the Board concluded that Huff's inspection of the object was incidental to his duty to insure that the work site remained safe and that no object that he and his spotter discovered on the grounds posed a threat to safety. Huff was not engaged in an activity completely unrelated to his work away from the construction site. On the contrary, he was in the immediate vicinity of his forklift in conversation with his coworker, who expressed concern about an object that he had found on the ground near them. Huff's testimony was unequivocal that *any* foreign object found at the workplace *had* to be retrieved and inspected. Thus, his action in picking up the object was part and parcel of the scope of his employment duties. In attempting to identify possible markings on the object, he unwisely ignited his lighter. Huff's testimony was that he had no idea that the object was explosive and that he was doing his best merely to identify it.

There is no evidence anywhere or testimony from anyone that he ignited his lighter in a jocular manner or that he teasingly tossed it into the air or in the direction of White. No indication of horseplay was present other than in the speculation of the ALJ and in the self-serving interpretation of events by Hall Contracting. The ALJ disregarded Huff's testimony and impermissibly substituted his own subjective impression in disregard and in derogation of Huff's explicit statement as to his own state of mind. An ALJ's prerogative does not extend so far and is not so absolute as to encompass or to allow for such an arbitrary conclusion—especially in light of the beneficent purpose that underlies the Workers' Compensation statutory scheme.

In light of the beneficent and remedial purposes of our Workers' Compensation Act, we conclude that the Board did not err by overlooking or misconstruing controlling law nor did it so flagrantly err in its evaluation of the evidence that it has caused a gross injustice by reversing and remanding this claim for further consideration. Indeed, to conclude otherwise would be flagrant error and gross injustice.

Therefore, we affirm the opinion of the Workers' Compensation Board.

NICKELL, JUDGE, CONCURS BY SEPARATE OPINION.

VANMETER, JUDGE, DISSENTS BY SEPARATE OPINION.

NICKELL, JUDGE, CONCURRING:

Respectfully, I concur with the majority. However, I write separately to provide further explanation.

Though vigilantly respectful of the prohibition against substituting an appellate court's factual findings for those of the trier, here, "when the curtain of conclusions and abstract contentions is removed, there is no substantial conflict in the evi-

dence" and the question is clearly one of law. *Ratliff v. Redmon*, 396 S.W.2d 320, 327 (Ky. 1965). While the General Assembly no longer requires liberal construction of the Workers' Compensation Act (Act), our judiciary has continued to do so with a view to effectuating the beneficent intention of its framers. *Standard Gravure Corporation v. Grabhorn*, 702 S.W.2d 49, 50 (Ky.App. 1986) (citation omitted). The primary purpose of the Act "is to aid injured or deceased workers," and courts "are required to interpret the workers' compensation statutes in a manner that is consistent with their beneficent purpose." *Kentucky Uninsured Employers' Fund v. Hoskins*, 449 S.W.3d 753, 762 (Ky. 2014). However, questions of law and questions of fact are distinguishable, and there is no requirement for liberal construction in favor of a claimant in the weighing of evidence. *Doan v. Cornett–Lewis Coal Company*, 317 S.W.2d 876, 878 (Ky. 1958).

Here, the ALJ dismissed Huff's claim for workers' compensation benefits based on the legal conclusion that the injury "did not arise out of the course and scope of his employment, but rather was suffered as a result of horseplay." In support, the ALJ cited *Hayes Freight Lines v. Burns*, holding employees injured while participating in "horseplay" are not entitled to compensation if the injury was independent and disconnected from the performance of any duty of employment. As stated in the opinion, the ALJ "found Huff to have given unreliable testimony" in claiming he had "ignited his lighter to better examine the object." Instead, the ALJ stated he "avoided discussion of whether or not Huff intentionally lit the object" in making the factual finding that he had "unreasonably and dangerously ignited the lighter" while holding the unknown object, "believed to be a smoke bomb." Based on these factual findings, the ALJ dismissed Huff's claim, determining he had engaged in "horseplay," and thereby rejecting his argument that he had lacked the "improper intent" required for "horseplay." *Haines v. Bellsouth Telecommunications, Inc.*, 133 S.W.3d 497, 500 (Ky. 2004).

In *Hayes Freight Lines*, the employer sought to reverse a judgment against it sustaining an award in favor of an injured employee who lost his left eye when a coworker turned toward him, ignited the fuse of a firecracker from a cigarette dangling from his mouth, and threw the firecracker against the floor "whereupon it exploded causing some foreign object to fly" into his eye. While the injured worker testified he realized his coworker's mischievous intent, he did not object or attempt to prevent the fuse from being lit from the burning end of his cigarette, eliminating any doubt that he was a willing participant.

The underlying question in *Hayes Freight Lines* was whether the causal event and resulting injury "arose out of and in the course" of the injured employee's employment. The words "in the course of employment" refer to the time, place, and circumstances of an injury, while the words "arising out of the employment" relate to the cause or source of the accident, and the terms are not synonymous. *Hollenbach v. Hollenbach*, 181 Ky. 262, 204 S.W. 152, 159–60 (1918).

In *Hayes Freight Lines*, the prevailing injured employee contended the trier's finding that the injury was compensable was a finding of fact and binding on the appellate court. However, our former Court of Appeals held otherwise, stating:

> There is no substantial dispute as to the facts relating to how the accident occurred, upon which the Board based its finding. The rule relied upon by appellee relating to the effect of a finding of fact by the Board is applicable only

where there is a disputed issue of fact. *If there is no issue of fact, the question on the fact becomes one of law, and the finding of the Board is a finding of law, although it might be styled a finding of fact.* The Act does not preclude us from inquiring into the correctness of a finding of law made by the Board.

*Id.* at 290 S.W.2d at 837 (emphasis added). Particularly where—as in the present case—there are no disputed underlying facts, determination of whether the underlying facts equate to "horseplay," thereby precluding compensability, is a matter of law and subject to appellate review.

In *Hayes Freight Lines,* the event causing the employee's injury occurred in the work place, during work hours, and was unquestionably sustained "in the course" of his employment. The real question presented was whether the employee's injury was sustained by an accident "arising out of" his employment; that is, within "the scope of employment." Noting that the phrase "arising out of" involved "the concept of causal relationship between the employment and injury," the Court held, if "the injury occurred by reason of some cause having no relation to the employment, it cannot be said to arise out of the employment." *Id.* (citations omitted).

As in the present case, the employer in *Hayes Freight Lines* argued the employee's injury was not compensable "because it did not arise out of his employment but was caused by horseplay." The Court agreed, stating:

> the general rule [is] that compensation is not recoverable under workmen's compensation acts for injuries sustained through *horseplay, done independently of and unconnected with the work of employment,* for the reason that such injuries could not be said to have been brought about while performing services

growing out of and incidental to employment.

*Id.* at 838 (emphasis added).

However, the Court recognized two exceptions to this general rule involving non-compensability of horseplay, including the injured employee's non-participation in the horseplay and the employer's knowledge of the horseplay without prohibition or interference. Because the injured employee unquestionably was not an innocent victim of the horseplay, but acquiesced and voluntarily assisted in lighting the firecracker fuse, the Court in *Hayes Freight Lines* held he "was a contributing cause of the firecracker being lighted" and did not qualify under the first exception. As to the second exception, the Court noted,

> [t]here was sufficient evidence which would have sustained the Board had it found that the shooting of the firecrackers took place over a substantial period of time, that the manager of the Company had actual knowledge that the employees engaged in exploding firecrackers, that he had actually participated in the practice, that neither he nor the Company had taken any steps to prevent it or warned against it, and that the Company could have reasonably expected that an injury might result to an employee from such shooting.

*Id.* at 839. Because the trier had made no factual finding as to whether it was customary for the employees to shoot firecrackers on the job, and because there "was some dispute as to some of the facts on the question, and the inference to be drawn therefrom," the Court remanded the matter, noting "had the Board made such finding, then it would have been justified in concluding that the injury arose out of the employment." *Id.*

Importantly, it is my view that *Hayes Freight Lines* does *not* offer a legal definition of "horseplay"—or, at least not a con-

cise definition. On this point I differ with both the majority and the dissent. A close reading of *Hayes Freight Lines* reveals the opinion merely holds that injuries caused by behavior "independent of and unconnected with work," *such as horseplay*, are—with few exceptions—not compensable. In effect, under *Hayes Freight Lines*, acts of "horseplay" are simply one type of non-compensable deviations *from* an employer's business or interest *to* a pursuit of the employee's own business or interest, independent and unconnected from the employer's purpose, direction, or control. *Collins v. Appalachian Research & Def. Fund of Kentucky, Inc.*, 409 S.W.3d 365 (Ky.App. 2012) (citations omitted). There are other instances of employee actions legally equating to behavior "independent of and not connected with work" that would not accurately be characterized as "horseplay."

Two civil actions provide guidance for differentiating "horseplay" from other types of non-compensable employee deviations from an employer's business or interest, and help to establish a precise definition. In *Haines*, a telephone service representative appealed from a summary judgment dismissing her civil claim for damages arising from serious hearing loss and permanent nerve damage caused by a supervisor's sounding of a boat horn within close proximity during a company motivational campaign. A prior panel of this Court affirmed the trial court, noting that an injured worker may not maintain an action against a coworker unless a "willful and unprovoked [act of] physical aggression" was committed. The Court held an act may be deemed to be "horseplay" and outside the scope of employment "if it is committed with *improper intent*." *Id.* at 133 S.W.3d at 500. To be considered "horseplay"—and thereby lift the immuni-

ty provision of KRS [1] 342.690—the Court held the offending coworker's action must be characterized by "*an ill intent or motive*," and be "so far removed from those [actions] which would ordinarily be anticipated by the employer," that he would have "removed himself from the course of his employment." *Id.* (emphasis added).

In *Jones v. Dougherty*, 412 S.W.3d 188 (Ky.App. 2013), another panel of this Court again addressed the definition of "horseplay" in a civil claim involving a teacher who appealed the trial court's grant of summary judgment based on the exclusive remedy provisions of KRS 342.690, where an assistant principal had entered the teacher's office with a snake, causing the teacher—who unbeknownst to the assistant principal was terrified of snakes—to scream and run into a concrete wall, thereby sustaining injuries to her knees and heart and suffering post traumatic stress syndrome. Though not asserting the assistant principal had engaged in "horseplay," the teacher argued the assistant principal's actions amounted to "willful and unprovoked physical aggression," thereby qualifying as an express exception under KRS 342.690 and negating the exclusive remedy provisions. *Id.* at 193.

On appeal, the Court applied the *Haines* analysis to a claim involving an allegation of willful and unprovoked aggression, stating:

[a]s we held in *Haines*, actions by a co-employee that fall outside what would ordinarily be anticipated by the employer negate the exclusive remedy provisions of the Act. Like the horseplay in *Haines*, willful and unprovoked physically [sic] aggression by co-employees falls outside what an employer would ordinarily anticipate. Therefore, such actions by a co-employee may negate the

1. Kentucky Revised Statutes.

exclusive remedy provisions of the Act. Furthermore, although intent is not specifically listed as a factor in KRS 342.690(1), the definition of "aggression"—an unprovoked attack or act of hostility—clearly implies such intent. As with horseplay, a court may take into account the intent of a co-employee when determining whether that co-employee's actions constituted willful and unprovoked physical aggression.

*Jones*, 412 S.W.3d at 194. Determining the undisputed evidentiary facts failed to prove the assistant principal's actions were "willful and unprovoked physical aggression," our Court affirmed the trial court's grant of summary judgment. In arriving at its decision, our Court noted "the Act does not define 'willful and unprovoked physical aggression' or any of the individual words in that phrase." *Id.* at 193. In such instances, our Court held "we look to the commonly understood meaning of the words." *Id.* (citing *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky. 2005)).

In the present appeal, the Board found the term "horseplay" to be undefined in the Act. Thus, the Board followed the guidance provided in *Haines* and *Jones* to establish the requisite improper intent for legally determining compensability by turning to the term's "commonly understood meaning."

First, the Board cited *Rex–Pyramid Oil Co. v. Magan*, 287 Ky. 459, 153 S.W.2d 895, 897 (Ky.App. 1941), wherein the employer argued it was immune from liability due an employee's "horseplay" immediately prior to being struck and killed by an automobile while crossing a highway to return to regular work duties. Determining the accidental death to have been work related and compensable, the Court characterized "horseplay" as an independent and unconnected playful or "sportive act," while the employee's accidental death was sustained "in the course of his employment" due to "elements of time, place and conditions".[2]

The Board then turned to *Webster's II New College Dictionary, Third Edition* (Houghton, Mifflin Company, Boston, Massachusetts 2005), to define "sportive" as "[p]layful: frolicsome." The Board also cited *Larson, Workers' Compensation*, Section 23.62(a), defining "horseplay" as "a whimsical method of performing" the "direct duties" of one's employment, and returned to *Webster's* to adopt its definition of "whimsical" as "capricious, playful, or fanciful" conduct.[3]

Because "horseplay" is not defined under the Act and case law provides only a partial understanding, the term requires clarification. Based on the foregoing, I believe the legal definition of "horseplay" as it pertains to the Act should be understood to mean: An intentional and signifi-

2. To this citation, I would add the language in *Tyler–Couch Const. Co. v. Elmore*, 264 S.W.2d 56, 58 (Ky. 1954), in which the former Kentucky Court of Appeals held, "the playful act of a stranger to [claimant's] employment" in causing serious burns by kicking over a flaming bucket of kerosene was "not a rational consequence of the work" in which the injured employee was engaged, and therefore not compensable. In describing the "horseplay" asserted by the employer, the Court referred to the stranger's behavior variously as "playing and pranking," "foolhardy conduct," "practical joking," and "rough play."

3. *Merriam–Webster's Collegiate Dictionary, Tenth Edition* (Merriam–Webster, Inc., Springfield, Massachusetts 2002) defines "horseplay" simply as "rough or boisterous play," and *Roget's International Thesaurus, Fourth Edition* (Thomas Y. Crowell Company, New York 1977), indicates the term is synonymous with "clownishness," "buffoonery," "misbehavior," "unsanctioned or non-sanctioned behavior," "disorderly conduct," "rowdiness," "ruffianism," or "roughhousing."

cant deviation from an employer's business or interest to a pursuit of the employee's own business or interest, independent and unconnected from the employer's purpose, direction, or control, and characterized by a willful and unsanctioned playful or mischievous motive.

In the present case, the Board held "we conclude as a matter of law Huff did not engage in horseplay," reversing the ALJ's legal determination, and remanding for further proceedings. I join the majority in affirming the Board's determination on this legal question pertaining to the proper understanding and application of the legal definition of "horseplay" to the undisputed underlying facts and the ultimate legal issue regarding compensability.

Here, I am convinced Huff's injury was more akin to what might formerly have been referred to as an unintended, unforeseen, and unfortunate "accident" arising from an "unusual, unexpected, and undesigned" event, "with or without negligence" on Huff's part. See *Totz Coal Co. v. Creech*, 245 S.W.2d 924, 925 (Ky. 1951). As with willful misconduct, more than mere negligence or even gross or culpable negligence is required to disqualify an injury from having arisen out of and in the course of employment due to horseplay. *Allen v. Columbus Mining, Co.*, 207 Ky. 183, 268 S.W. 1073, 1074 (1925).

Based on the ALJ's underlying factual findings, Huff's act of igniting his lighter in close proximity to the unknown object—whether for greater visibility or to verify any suspicion that it might be explosive—was a "stupid decision"—as Huff, himself, describes it. But whether a "stupid decision" or an act of ignorance, poor judgment, negligence, investigation, curiosity, impulse, or otherwise, it does not equate to "horseplay." Here, there is no evidence that Huff's action and resulting serious injury arose from a deliberate and con-

scious excursion or abandonment of his job duties to accomplish an improper motivation for playfulness or mischief. Instead, Huff's conduct—regardless of how unintelligent or unwise—was connected to his inspection of a possibly misplaced or potentially dangerous unknown object found by a coworker on a worksite over which he was responsible for securing, and was, therefore, incidental to his employment.

## VANMETER, JUDGE, DISSENTING.

I respectfully dissent. In my view, the majority opinion overstates or misapplies the ability of the Workers' Compensation Board to review the factual findings of the Administrative Law Judge. I acknowledge the oft-stated standard of review for the appellate courts of a workers' compensation decision "is to correct the [Workers' Compensation] Board only where the Court perceives the Board has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice." *E.g., Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687–88 (Ky. 1992); *Butler's Fleet Serv. v. Martin*, 173 S.W.3d 628, 631 (Ky.App. 2005); *Wal-Mart v. Southers*, 152 S.W.3d 242, 245 (Ky.App. 2004). *See also Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986) (if the fact-finder finds in favor of the person having the burden of proof, the burden on appeal is only to show that there was some substantial evidence to support the decision); *cf. Gray v. Trimmaster*, 173 S.W.3d 236, 241 (Ky. 2005) (if the ALJ finds against the party having the burden of proof, the appellant must "show that the ALJ misapplied the law or that the evidence in her favor was so overwhelming that it compelled a favorable finding").

In this case, the factual dispute presented is whether Huff, when he lit his lighter in proximity to the round silver object, (a)

was aware the object was a firework or a smoke bomb of some sort and was trying to light it; or (b) did not know what it was and was investigating a potentially dangerous object by seeking to illuminate it better with his lighter. The testimony considered by the ALJ and his discussion and findings are as follows:

### Discussion of Evidence

1. Plaintiff **James Huff** is a 38–year–old resident of Fordsville, Kentucky. He began work for the [Employer] as a heavy equipment operator in 2007. On the date of injury, August 26, 2011, he was working a riverbank project at a public park. He reported to work between 6:00–7:00 a.m. It had been "headlight dark" when he arrived, and it was still dark when he started work. (depo p. 28). After attending a 10–minute safety meeting with the job site superintendent he had moved on to his assignment for the day, which was to work with Keith White in moving telephone poles that had been taken down. He still had to use the headlights on the forklift when work started. Besides being dark, it was cloudy. White was his spotter on the ground. This was still before 7:00 a.m. They were in a fenced-in, secure area.

He believes the accident happened about 15 minutes after he started work that day, right after 7:00 a.m. He was looking for dunnage boards to lay the telephone poles on when White walked up to him holding a black object that was between a tennis ball and a golf ball in size. White said he found the object next to some pallets on the ground. White asked him if he knew what the object was. White then handed the object to him. There was an indention [sic], or crevice, in the object. There were no symbols or markings on it. There was no visible fuse, or "nothing indicating that it was flammable or ex-

plosive in any way." (p. 37). He described what happened next, at page 38:

> Around the outside, looking for markings, lettering, anything. Look inside the crater, cratered-in indention spot, reach in my pocket to take out my lighter ... to shine a light inside—to look for anything of indication. I don't even remember if I got close to it. I mean it exploded instantly. I mean ... it just exploded. Like I said, I don't remember if I even touched it or got close to it ... as soon as I struck my lighter, it was no hesitation. It was an explosion.

Asked why he didn't just discard the item, he said, "Same reason why Keith was curious on what the item was when he brought it over to me. I mean, he could have took it to the superintendent also or he could have discarded it also. But you don't know what you are discarding ... we had 13 different subcontractors. If some other contractor on the job site was using that particular item. But there was no contractors on the job site using explosives." (p. 38–39).

Asked why he took out his lighter to investigate instead of taking the item to the superintendent, he said, "There was no initial danger at the time. I mean, nothing to say that it was dangerous." (P. 39).

Asked if identification of the object was essential to the pending job task, he said "No ... it was just in the way. We had to clear out for that, so, I mean, if it was a piece of paper laying there, I'd have to pick it up and take it over to the dumpster before I could set the telephone poles down. So anything right there in that immediate area, I would have to deal with." (p. 39).

Asked why he wouldn't have discarded the object like a piece of paper on the

ground, he said, "Because it was brought to me. If I'd picked it up, I probably would have. But when it was brought to me and asked what it was, I was looking more closely on what it was ... I wish he (White) would have taken [it] to Dennis, the superintendent or someone more in charge than me to start off with." (p. 40). He and White were equals in terms of job titles, but he had more seniority.

He said his memory is sketchy on certain details of the accident. He said it was possible that White told him not to ignite his lighter. He said White "spun around" when he took out his lighter. (p. 44). He said White must have been concerned that the object would explode. This all happened instantaneously. The object exploded as soon as he struck the lighter. The explosion "tore my palm out, and my thumb was literally hanging toward my upper arm." (p. 47). He was not interviewed by the [Employer] after the accident, but he did speak with the human resources manager, Susan Summers, which, to the ALJ, is the same thing.

. . . .

8. The [Employer] filed a **meteorological table** documenting that sunrise on August 26, 2011, was at 6:13 a.m. The [Employer] also filed a **weather analysis report**. It states that while sunrise on August 26, 2011, was at 6:13 a.m., natural light from the sun without the need for artificial lighting was available beginning at 5:46 a.m. The report further states that on August 26, 2011, "the sky was clear, no precipitation was occurring, and the temperature was near 69F."

9. The [Employer] took the deposition of **Keith White**, a construction laborer at Hall Contracting since July of 2011. White confirmed that he, Huff and others were moving telephone poles on the morning of Huff's injury. He believes they started work between 6–6:30 a.m., and that the injury occurred about an hour-and-a-half into the work day. He said the sun had risen by the time the work day started, and that it was fully light outside when the injury occurred. (p. 9). Asked on cross examination whether it was overcast, he said, "It could have been overcast. I mean it wasn't bright sunlight but it was daylight." (p. 25).

He said that company policy was to notify a foreman or supervisor when a potentially dangerous object is found on the job site. He found two objects—a Roman candle and a silver ball about the size of a tennis ball near the roadway in front of the construction trailer office. The ball looked like it had sunk in the ground from a rain a day or two before. He picked up both objects. He was familiar with Roman candles, and knew that it had already been burnt, or used so he threw it back on the ground. He "wasn't sure" about the silver ball, and that is why he picked it up and walked over to show it to Huff. (p. 30). There was sufficient natural light to fully examine the ball. He said it looked like it had a thin aluminum foil coating. "It was round and it has what I call a nipple or a place where a wick would be." (p. 13). There appeared to be a "burnt spot" there; "it could have been a firework." (p. 14–15). He did not see a wick or fuse. There were no markings on the ball. Over the 15 or so feet it took him to reach Huff, he noticed the nipple area that could accommodate a wick or fuse, and became concerned that it might be dangerous. He said, "I was looking (at) it and he (Huff) took it from me and started looking at it." (p. 15). He said he and Huff "both commented it could be a smoke bomb or a firework or some-

thing." (p. 17). After about 45–60 seconds, he said Huff then reached as if he was going to pull out a lighter, and, "I started to back up and I told him I wouldn't do that." (p. 17). The reason he backed up was "I didn't know what it was. I was afraid of what it might be and I didn't want to get in trouble. I had no idea. I just knew that it probably wasn't a good idea." (p. 18). He had turned away and was about six or seven feet from Huff when the object exploded. He said he was "a little" concerned about his own safety when it appeared as if Huff was going to light the object. On cross, he said that he would not have initially picked up the object if he thought it was dangerous. He gave statements about the incident to his employer, two police detectives, and possibly a workers' compensation representative.

10. The [Employer] submitted testimony from **Susan Summers**, the human resource manager for the [Employer]. Huff's accident occurred on a Friday, while she was out of the office, and thus began investigation of it over the weekend. When she contacted Jewish Hospital on Saturday, Huff had been released. She spoke with Huff and his father later that day. Huff told her that he had lit the object, and that the reason he had done so was because he thought it was a smoke bomb. When she asked him why he had lit the object, "He told me he did not know. He just made a stupid decision." (p. 9). Huff never said he had not intended to light the object. He did not mention that he had used a lighter to be able to better see the object in dark conditions. She said White's deposition testimony is consistent with what he had told her on August 30. She said Huff was terminated from employment (by letter dated August 31) based on his

actions in the subject incident. Prior to this incident, Huff was a good employee.

11. The [Employer] submitted evidence from **James Martin**, a police officer in Owensboro. The call for help following Huff's accident was made at 7:03 a.m., he was dispatched to the scene at 7:04 a.m., he arrived five minutes later. He said it was a "bring [sic], sunny and clear" morning. (p. 4). He spoke with Keith White, but does not remember speaking to Huff. Based on what White told him, he prepared an incident report stating that Huff "found what he thought was a smoke bomb at the construction site. He picked it up ... and lit it, lit the short fuse. The item then exploded in his hand." The ALJ reviewed the dispatch log and other attachments to Martin's deposition.

. . . .

## Findings and Conclusions

Employees injured while participating in "horseplay" are not entitled to compensation if the injury was independent of and disconnected from the performance of any duty of employment. *Hayes Freight Lines v. Burns*, 290 S.W.2d 836 (Ky. 1956). This rule has developed from the "positional risk" theory—that the employer will only be liable for injuries for which the employment placed the employee in a position of risk to sustain. "Horseplay" is disconnected from such a risk and therefore does not arise out of and in the course of employment. *Id.* The *Hayes Freight Lines* case involved an employee who lost an eye when a firecracker exploded after a co-worker placed it at the end of the employee's cigarette. The injured worker did not jerk the cigarette away or tell the co-worker not to the light the firecracker. The Court held that the worker therefore assisted in lighting the fire-

cracker, and his horseplay disallowed compensation.

In reviewing the evidence in this claim, the ALJ was mindful of Huff's testimony that he emphasized at the Hearing—that he had not engaged in horseplay because he did not light the object; rather, he ignited his lighter to better examine the object and it exploded instantaneously. This theory was reinforced in [Huff's] Brief, where he argued that his "improper intent," a requisite in the case law, had not been demonstrated. *Haines v. Bellsouth Telecommunications, Inc.,* 133 S.W.3d 497 (Ky. 2004) [sic[4]]. But upon careful review of the evidence, the ALJ finds insufficient support for that position; Huff has not sustained his burden of proving the work relatedness of his injury.

The ALJ found Huff to have given unreliable testimony as to the extent of daylight and the nature of the weather on the morning of his accident. The [Employer's] evidence as to the weather that day and the testimony from Keith White confirmed that there was plenty of daylight as of 7:00 a.m., the earliest suggested time from the evidence for when the accident occurred. There was no need for a lighter to better illuminate the object. Even if there had been inadequate light, there was recognition between the two men, according to White, that the object had an indention [sic] that might accommodate a fuse; that it might be a firework or smoke bomb; and that it might be dangerous—circumstances that create an act of horseplay in the very act of igniting the lighter. White said to Huff, "Bill, I wouldn't do that," when Huff appeared to be reaching for a lighter, and backed away out of concern for his own safety; Huff acknowledged that he heard and observed this from White and proceeded to ignite the lighter anyway. White said he and Huff were waiting for the supervisor to return to their work area after a cell phone call to give instruction on where to move the telephone poles, so there was no reason not to leave the object alone until the supervisor returned. (p. 31–32). Huff ventured outside the course and scope of his employment in igniting the lighter, which therefore renders the resulting injury not compensable.

The ALJ also relied on the testimony from Summers, who spoke to Huff the day after the accident. Huff told her it was a "stupid decision" to light what was believed to be a smoke bomb; and he made no remark to her about not having intended to light the object, or about alleged darkness being the reason he used the lighter to better see what he was holding. The ALJ believes that Huff acknowledged the nature of his actions to Summers because her company would not have otherwise abruptly terminated a good employee.

That long narrative is necessary because it demonstrates that the ALJ considered the testimony of Huff, the coworker White, the employer's human resources administrator Summers, and police officer Martin and made the factual finding that Huff's testimony was not credible. The ALJ found that Huff was aware the object was a firework or smoke bomb and that he was trying to light it. In other words, the ALJ made a factual finding that Huff was lighting a firework on company time—a stupid decision, as acknowledged by Huff. While the Board or we might weigh the testimony differently or come to a different conclusion, the ALJ is the fact-finder.

4. *Haines* is an opinion of the Kentucky Court of Appeals.

"When one of two reasonable inferences may be drawn from the evidence, the finders of fact may choose." *Jackson v. Gen. Refractories Co.*, 581 S.W.2d 10, 11 (Ky. 1979). Furthermore, KRS 342.285(2) explicitly provides that "[t]he board shall not substitute its judgment for that of the [ALJ] as to the weight of the evidence on questions of fact." In *Gaines Gentry Thoroughbreds/Fayette Farms v. Mandujano*, 366 S.W.3d 456 (Ky. 2012), the Kentucky Supreme Court addressed the authority of the ALJ and subsequently the Board's and the courts' standard of review:

> KRS 342.285 designates the ALJ as the finder of fact in workers' compensation cases. It permits an appeal to the Board but provides that the ALJ's decision is "conclusive and binding as to all questions of fact" and, together with KRS 342.290, prohibits the Board or a reviewing court from substituting its judgment for the ALJ's "as to the weight of evidence on questions of fact." Thus, KRS 342.285 gives the ALJ the sole discretion to determine the quality, character, and substance of evidence. As fact-finder, an ALJ may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same party's total proof.

366 S.W.3d at 461 (citations omitted). Evidence that would have supported but not compelled a different decision is an inadequate basis for reversal on appeal. *Id.* (citing *McCloud v. Beth–Elkhorn Corp.*, 514 S.W.2d 46 (Ky. 1974)).

If the ALJ finds against the party having the burden of proof, on appeal the appellant must "show that the ALJ misapplied the law or that the evidence in [his] favor was so overwhelming that it compelled a favorable finding." *Gray*, 173 S.W.3d at 241. Huff had the burden of showing work-related injury, and the ALJ found against Huff's version of the events leading up to the explosion which resulted in the injury. From that finding flows the legal conclusion that Huff was engaged in horseplay, *i.e.*, "an action independent of and not connected with work." *Hayes Freight Lines, Inc. v. Burns*, 290 S.W.2d 836 (Ky.1956). By contrast, the Board appears to have adopted a definition of "horseplay" as encompassing whimsical play, a definition that has not been adopted by Kentucky's courts. In *Hayes*, Kentucky's highest court addressed the concept of horseplay, as follows:

> It is unquestioned that [employee] was injured at his working place during working hours, and, therefore, in the course of his employment. The real question is whether the injury was sustained 'by an accident arising out of' his employment. KRS 342.005. The phrase 'arising out of' involves the concept of causal relationship between the employment and injury. If the injury occurred by reason of some cause having no relation to the employment, it cannot be said to arise out of the employment. *Louisville & Jefferson County Air Board v. Riddle*, 301 Ky. 100, 190 S.W.2d 1009 [ (1945) ]; *Harlan–Wallins Coal Corp. v. Stewart*, Ky., 275 S.W.2d 912 [ (1955) ]; *Taylor v. Taylor Tire Co.*, Ky., 285 S.W.2d 173 [ (1955) ].
>
> As the basis for annulling the award, [employer] strongly argues that the injury to the [employee] is not a compensable injury because it did not arise out of his employment but was caused by horseplay. It seems to be the general rule that compensation is not recoverable under workmen's compensation acts for injuries sustained through horseplay, done independently of and unconnected with the work of employment, for the reason that such injuries could not be said to have been brought about while performing services growing out of and

incidental to employment. 58 Am.Jur., *Workmen's Compensation*, sec. 268; 13 A.L.R. 540, Annotation. But there are certain recognized exceptions to the general rule and we shall mention two of them here because of their possible application: (1) non-participation of an injured employee in the horseplay, and (2) where horseplay was known to the employer who permitted it to continue without interference. *Phil Hollenbach Co. v. Hollenbach*, 181 Ky. 262, 204 S.W. 152, 13 A.L.R. 524; *Tyler–Couch Const. Co. v. Elmore*, Ky., 264 S.W.2d 56; Schneider, Workmen's Compensation, Vol. 6, sections 1609, 1612.

*Hayes Freight Lines, Inc.*, 290 S.W.2d at 837–38.[5]

The evidence, as found by the ALJ, was that Huff, the injured employee, did participate in the horseplay, and that the horseplay was not known to Hall Contracting, the employer. Despite the majority's assertion regarding the beneficent purposes of the Workers' Compensation statutes, employers are not liable for injuries sustained by employees that do not "arise[ ] out and in the course of employment[.]" KRS 342.0011(1); *see Wells v. Gen'l Elec. Co.*, 318 S.W.2d 865, 867 (Ky. 1958) (holding that "[a] liberal construction of the [Workers' Compensation] Act does not dispense with the imperative duty of a claimant to prove his case[ ]").[6] I would vacate the Board's decision and remand

with direction to reinstate the ALJ's decision.

---

5. It should hardly be necessary to state that we are "bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court." Kentucky Rules of Supreme Court 1.030(8).

6. As an aside, in *Wells*, the court was interpreting KRS 342.004 which provided, at that time, "[t]his chapter shall be liberally construed on questions of law, as distinguished from questions of fact, and the rule of law requiring strict construction of statutes in derogation of the common law shall not apply

to this chapter." This statute was repealed in 1980. 1980 Ky. Acts ch. 104, § 24. Despite this revocation, KRS 446.080(1), currently in effect, contains virtually identical language.

